# In the United States Court of Federal Claims

No. 24-1906C
(Filed: May 13, 2026)
**FOR PUBLICATION**

```
****************************************
THE KILI/BIKINI/EJIT LOCAL           *
GOVERNMENT COUNCIL, on behalf        *
of THE PEOPLE OF BIKINI, et al.,     *
                                     *
              Plaintiffs,            *
                                     *
v.                                   *
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
****************************************
```

*Jonathan M. Weisgall*, Washington, D.C., for Plaintiffs. With him on the briefs were *Robert K. Huffman*, *Qijia Yu*, *Madeline Pruhs*, and *Christine Nelson*, Covington & Burling LLP, Washington, D.C.

*Bryan M. Byrd*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Martin F. Hockey, Jr.*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well as *Timothy Murphy* and *Leah Bernhardi*, Office of the Solicitor, United States Department of the Interior, and *Violanda Botet* and *Liam B. Smith*, Office of the Legal Adviser, United States Department of State. At oral argument for Defendant, *Matthew J. Carhart,* Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

Plaintiffs — representatives of the Bikini Atoll community — want the United States to replenish a trust that Congress established for their benefit after nuclear testing rendered their islands uninhabitable. Compl. (ECF 1). To summarize, Congress appropriated tens of millions of dollars almost fifty years ago to meet its moral obligation to the Bikini people. The United States supervised the use of those funds for decades. But when the Bikini people demanded the opportunity to manage the money themselves, the United States agreed. Once they got the authority they

wanted, the money rapidly disappeared. Plaintiffs now characterize the trust's loss — approximately $63 million — as damages inflicted on them by the United States when it gave them the control they asked for. They claim, in essence, that the United States should be obligated to refill the tank with as much money as the trust had before they took control, plus interest.

Defendant moved to dismiss the Complaint pursuant to RCFC 12(b)(1) and 12(b)(6). Def.'s Mot. to Dismiss (ECF 9). The motion has been fully briefed, and I have heard oral argument. Pls.' Opp'n (ECF 14); Def.'s Reply (ECF 17); Oral Arg. Tr. (ECF 20) ("Tr."); *see also* Pls.' Notice of Suppl. Authority (ECF 21). For the reasons set forth below, Defendant's motion is **GRANTED**.

## BACKGROUND

Beginning in 1946, the United States tested nuclear weapons at Bikini Atoll, part of the Marshall Islands. The atoll's residents were relocated during the nuclear testing, and persistent radioactive contamination prevents their return. Compl. ¶¶ 7, 14–18.[1] They are now living elsewhere in the Marshall Islands, including Kili and Ejit islands. *Id.* ¶ 19. The Kili/Bikini/Ejit Local Government Council ("Council") is the elected body representing the Bikini people. *Id.* ¶ 4.

When it became apparent that the Bikini people could not return to their islands, Congress adopted a series of measures for their benefit.

In 1982, Congress appropriated $19.6 million to establish a trust "for the relocation and resettlement of the Bikini people in the Marshall Islands[.]" Pub. L. No. 97-257, 96 Stat. 840 (1982); Compl. ¶ 19. Congress provided in the same act that the United States "shall not be liable in any cause of action in law or equity from the administration and distribution of the trust funds[.]" Pub. L. No. 97-257, 96 Stat. 840 (1982); Compl. ¶ 19.

The Bikini people and the United States entered a trust agreement later that year, establishing the Resettlement Trust Fund for the People of Bikini (the "Trust"). Compl. ¶¶ 19–20; Def.'s Suppl. App. at SA1–19 (ECF 17-1) ("Trust Agreement").[2] The Trust Agreement provided for administration of the Trust's funds by a trustee to be appointed by the Council with the approval of the Secretary of the Interior. Def.'s Suppl. App. at SA3, SA7–14. The Trust Agreement could be modified by the Council, subject to disapproval by the Secretary. *Id.* at SA14.

---

[1] I take the undisputed facts in the Complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[2] The Court may consider documents incorporated by reference in the complaint or integral to it without converting a motion to dismiss into one for summary judgment. *See Bell/Heery v. United States*, 106 Fed. Cl. 300, 307–08 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir. 2014) (citations omitted).

In 1988, Congress appropriated another $90 million to be "deposit[ed] … into the Resettlement Trust Fund for the People of Bikini established pursuant to Public Law 97–257, and governed pursuant to the terms of" the Trust Agreement. Pub. L. No. 100-446, 102 Stat. 1773, 1798 (1988); Compl. ¶ 21. The 1988 appropriation modified the Trust Agreement in certain respects. It provided that the Trust's "corpus and income may be expended for rehabilitation and resettlement of Bikini Atoll, except that the Secretary may approve expenditures not to exceed $2,000,000 in any year from income for projects on [the islands of] Kili or Ejit[.]" Pub. L. No. 100-446, 102 Stat. 1798 (1988); Compl. ¶ 22. It also required that "one year prior to completion of the rehabilitation and resettlement program, the Secretary of the Interior shall report to Congress on future funding needs on Bikini Atoll." Pub. L. No. 100-446, 102 Stat. 1798 (1988); Compl. ¶ 22.

After that additional appropriation, the Council and the United States amended the Trust Agreement. Compl. Ex. A (ECF 1-2) ("Amended Trust Agreement"). The Amended Trust Agreement retained much of the original Trust Agreement's structure, including appointment of a trustee and amendment of the agreement by the Council subject to the Secretary's oversight. *Id.* ¶¶ 5.1, 10.1.

The Amended Trust Agreement modified the original, though, in a few ways that are relevant here. It incorporated the Secretary's new statutory obligations. Compl. ¶ 24; Compl. Ex. A ¶¶ 4.1, 9.1. It also required the Secretary's written approval for distributions of income over $100,000. Compl. Ex. A ¶ 9.3. In 1990, the parties adopted a Memorandum of Agreement providing for further oversight of Trust expenditures by the Department of the Interior. Compl. ¶ 26; Compl. Ex. B ¶¶ 2.1–2.2 (ECF 1-3).

That arrangement lasted for nearly three decades, during which Plaintiffs allege the Trust "was prudently managed for sustainable community development." Compl. ¶ 25. In 2017, though, the Council adopted what it called the "Rescript of the KBE Resettlement Trust Fund" ("Rescript"). Compl. ¶ 27; Compl. Ex. C (ECF 1-4).

In the Rescript, the Council asserted that the Secretary's supervision of Trust expenditures under the Amended Trust Agreement and the Memorandum of Agreement went beyond what Congress required. Compl. Ex. C at 1. The Council also claimed that the Trust was inadequate to remediate and resettle Bikini Atoll, and that "budget impositions placed on" the Council by the Secretary had "handicapped" its efforts to develop "income-generating projects for the future funding for the People of Bikini[.]" *Id.* at 1–2.[3] The Council accordingly declared that it intended to "take[]

---

[3] That is in some tension, of course, with Plaintiffs' current allegation that the Trust was "prudently managed" before the Rescript. Compl. ¶ 25.

back its responsibility over the Trust as the duly elected body representing the People of Bikini[.]" *Id.* at 2 ¶ 1.

The Rescript proposed to overhaul the Amended Trust Agreement by removing checks on the Council's budgetary authority. The Council would "no longer recognize[] the authority of the Department of the Interior, or other United States entities, to approve the annual budget of the [Council] from the Trust[.]" *Id.* The Rescript repudiated any such oversight under the Amended Trust Agreement or the Memorandum of Agreement as "null and void." *Id.* "Any and all policy or guidelines" adopted by the United States that were "in conflict with the autonomy of the [Council] to determine its own future" were likewise "null and void." *Id.* at 2 ¶ 2. The Council would henceforth provide the Secretary with its budgets "only for the purpose of reference[.]" *Id.* at 2 ¶ 4. The trustee would "no longer retain[] any rights to question drawdown requests from the Trust[.]" *Id.* at 2 ¶ 5.

The Department of the Interior accepted the Rescript as an amendment to the Trust in November 2017. Compl. ¶¶ 28–29; Compl. Ex. D (ECF 1-5). In a letter to the then-Mayor, the Assistant Secretary for Insular Affairs noted that the Secretary had two specific statutory obligations related to the Trust, *i.e.*, to "approve expenditures not to exceed $2,000,000 in any year from income for projects on [the islands of] Kili or Ejit," and to report to Congress "one year prior to completion of the rehabilitation and resettlement program." Compl. Ex. D at 2 (quoting Pub. L. No. 100-446, 102 Stat. 1798 (1988)). But the Assistant Secretary reported that the Department otherwise regarded the Rescript "as a valid amendment" to the Amended Trust Agreement. Compl. Ex. D at 1. The Assistant Secretary assured the Mayor that the Department "shall never again interact with you or the Members of the [Council] on any aspect" of the Trust, and sent the Mayor off with his "warmest, best wishes." *Id.* at 2.

Things did not go at all as the Council intended. In 2018, the Trust had a market value of approximately $63 million. Compl. ¶ 59. By 2024, it stood at less than $90,000 — a loss of over ninety-nine percent. *Id.*

The Complaint does not identify the specific transactions or decisions that depleted the Trust. It does not allege any particular expenditures, investments, or transfers of Trust assets, nor does it describe how the Trust's funds were used during that period. Plaintiffs attribute the loss to actions by the then-Mayor, the Council's leadership, and a new trustee selected after 2017, but they do not allege any details. Compl. ¶¶ 2, 47. Plaintiffs conceded at argument that they do not know how the Trust funds were spent after the Rescript. *See* Tr. at 18–19.

That brings us to the present lawsuit. Plaintiffs claim that by stepping away from direct supervision of the Trust, the United States breached its contractual or

statutory oversight duties. Compl. ¶¶ 56–58, 62–63. They seek damages "in the amount of at least $63 million, plus the fair market value of the income the Resettlement Trust would have earned had [the United States] … provided the necessary oversight to preserve the Resettlement Trust." *Id.* at 23 ¶ 1.

## DISCUSSION

Defendant moved to dismiss for lack of jurisdiction and for failure to state a claim, presenting several arguments in support of each theory. I conclude that Congress has reserved immunity from Plaintiffs' claims by statute, and — in the alternative — that Plaintiffs have failed to plead that the United States breached any duty. I need not reach Defendant's remaining arguments.

## I. Statutory Immunity

### A. The United States Is Immune As A Matter Of Law

When Congress established the Trust, it specified that the United States "shall not be liable in any cause of action in law or equity from the administration and distribution of the trust funds[.]" Pub. L. No. 97-257, 96 Stat. 840 (1982). That provision governs the Trust to the present day, and forecloses Plaintiffs' suit.

The United States may be sued only by its consent. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). When it waives sovereign immunity, "the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* That means Congress can both confer jurisdiction and take it away. For example, although the Tucker Act's waiver of sovereign immunity extends to "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States," *see* 28 U.S.C. § 1491(a)(1),[4] Congress can nonetheless except specific categories of cases that this Court may not hear. *See, e.g.*, *United States v. Fausto*, 484 U.S. 439, 443–44 (1988); *Goad v. United States*, 976 F.2d 747, 1992 WL 190516, at *1 (Fed. Cir. 1992) (unpublished table decision); *Millard v. United States*, 16 Cl. Ct. 485, 488 (1989), *aff'd,* 916 F.2d 1 (Fed. Cir. 1990). When Congress has "unambiguously withdrawn or withheld" jurisdiction by statute, *see Slattery v. United States*, 635 F.3d 1298, 1301 (Fed. Cir. 2011), the Tucker Act's grant of jurisdiction yields.

---

[4] The Tucker Act creates jurisdiction, not a cause of action, so most claims in this Court must be based on a contract with the United States, an exaction of money, or a "money-mandating" source of law. *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005); *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996). It is not at all apparent that Plaintiffs' claims have any such basis, but I do not need to resolve the issue because the United States is immune in any event. For the same reason, I do not address whether Plaintiffs' claims are within the statute of limitations.

The immunity provision in the 1982 law is about as plain and unambiguous as it gets. If a claim involves "the administration and distribution" of Trust money, the United States "shall not be liable." Pub. L. No. 97-257, 96 Stat. 840 (1982). This Court lacks jurisdiction when Congress uses such language. *Goad*, 1992 WL 190516, at *1 (citing 10 U.S.C. § 1408(f)(1) (1988)); *Millard*, 16 Cl. Ct. at 488 (citing 42 U.S.C. § 659(f) (1982)).

## B. Plaintiffs' Responses

Plaintiffs have several responses, but none gets around the evident meaning of the immunity provision.

### 1. *The immunity provision has not expired.*

Plaintiffs point out that the immunity language did not appear in the 1988 appropriation that added more money to the Trust and modified the Trust's terms. Pls.' Opp'n at 9–10. In general — they explain — a provision of law enacted in an appropriation is presumptively limited to that fiscal year "unless the language used therein or the nature of the provision makes it clear that Congress intended it to be permanent." *Id.* at 11 (quoting U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* 2-86 (4th ed. 2016)). That does not help Plaintiffs.

To begin with, the "nature" of the immunity provision requires that it be treated as permanent. *Principles of Federal Appropriations Law* 2-86. Congress tied immunity to "the trust funds," *see* Pub. L. No. 97-257, 96 Stat. 840 (1982), not any particular period of time. The Trust, moreover, was to be administered over the course of years. It is hard to see the logic of limiting the United States' immunity to the first year of a trust that Congress expected to exist indefinitely.

A time-limited immunity provision might not even have any practical effect at all. The main statutes of limitations for suits against the United States run for more than one year, *see* 28 U.S.C. §§ 2401(a), 2501, so an immunity provision limited to a fiscal year would expire before the statute of limitations covering the supposedly immunized conduct. On Plaintiffs' interpretation of the immunity provision, no conduct would actually be immunized from suit.

Courts ordinarily avoid interpreting statutes in ways that would render them meaningless. *GPX Int'l Tire Corp. v. United States*, 678 F.3d 1308, 1312 (Fed. Cir. 2012) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57–58 (2006)); *see also Accura Eng'g & Consulting Servs., Inc. v. United States*, 167 Fed. Cl. 258, 274 (2023) (citing *Sharp v. United States*, 580 F.3d 1234, 1238 (Fed. Cir. 2009)). That principle applies when determining whether appropriations provisions are permanent. *Principles of Federal Appropriations Law* 2-91 ("[A] provision may be

construed as permanent if construing it as temporary would render the provision meaningless or produce an absurd result."). In order to give it effect, the immunity provision must be treated as permanent, not time-limited.

Nor, in fact, do Plaintiffs themselves rely on the fiscal-year presumption. They conceded at argument that the immunity provision *did* extend beyond the 1982 fiscal year. *See* Tr. at 24–28. Instead, they argue that the immunity provision was repealed by the 1988 revisions to the Trust. *See* Pls.' Opp'n at 12–14; *see also* Tr. at 25–28.

That makes things harder for Plaintiffs, not easier. Once Plaintiffs lose the argument that the immunity provision expired automatically, they are stuck with the presumption that it remained in effect until repealed. And because the 1988 law did not expressly repeal immunity, Plaintiffs are effectively arguing for repeal by implication. Tr. at 28. Implied repeals are highly disfavored. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190 (1978). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Id.* (quoting *Morton v. Mancari*, 417 U.S. 535, 550 (1974)) (alteration omitted).

Yet nothing in the 1988 statute reflects any intent to withdraw or modify the earlier reservation of immunity. Congress appropriated additional sums to be deposited into the same trust and directed that those funds be administered under the existing framework. Pub. L. No. 100-446, 102 Stat. 1798 (1988). The statute does not mention the immunity provision, let alone alter it. It specified certain modifications to the Trust, but not to immunity. Plaintiffs have no authority for implied repeal under remotely analogous circumstances. Tr. at 28–29. In the absence of a clear conflict with the immunity provision, there is no ground for inferring an implied repeal. Because Congress did not withdraw the immunity it enacted in 1982, that provision remained operative.

2. *The immunity provision covers alleged failures to act.*

Plaintiffs' other jurisdictional argument is that even if the immunity provision remained in effect, it does not cover the exact government misconduct they allege. Pls.' Opp'n at 17–19. Plaintiffs claim that the United States neglected its obligations to supervise the Trust — in other words, that the government failed to act when it should have. *Id.* at 19. According to Plaintiffs, the government's immunity from claims involving "the administration and distribution of the trust funds" covers only *action*, not *inaction*. *See id.* The argument is creative, but meritless.

The ordinary rule appears to be that when immunity attaches to the performance of a governmental or regulatory function, it protects discretionary judgments about how that function will be exercised, including decisions not to

intervene or not to deploy particular oversight mechanisms. Courts therefore hold that immunity does not depend on whether the challenged conduct is framed as action or inaction. *See, e.g., United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813–14, 819–20 (1984); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 97 (2d Cir. 2007); *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105–06 (2d Cir. 2001). Plaintiffs cite no authority to the contrary — only a few state statutes that happen to specify immunity for both action and inaction. *See* Pls.' Notice of Suppl. Authority at 3. Their argument thus rests on a distinction without a difference.

Plaintiffs' theory trips, moreover, on two textual hurdles.

First, Plaintiffs assume that immunity is limited to Trust-related actions *by the United States*. But that is not quite what Congress said. The United States is instead immune from claims challenging "the administration and distribution of the trust funds." Pub. L. No. 97-257, 96 Stat. 840 (1982). The presence of the definite article signals that the scope of the key phrase — "administration and distribution" — "has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 407–08 (2019) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)). The relevant context is the preceding discussion of how the Trust will be created and constituted, including ratification of a trust agreement, the selection of a trustee, and the use of funds. *See Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1076 (9th Cir. 2016) ("Congress's use of the definite article … serves as an internal reference to other statutory subsections[.]").

"[T]he administration and distribution of the trust funds" thus covers not just acts of the United States, but the whole Trust system — and the United States is immune as to *all* of it, not just from challenges to its own acts. *Cf. Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 375 (2021) (Gorsuch, J., dissenting). That makes sense. It would be peculiar for Congress to immunize the United States from lawsuits involving government acts, but preserve claims arising from the acts of others when the United States did nothing.

Second, Congress extended immunity not just to "*administration*," but to "*distribution*" of Trust funds. Pub. L. No. 97-257, 96 Stat. 840 (1982) (emphasis added). Plaintiffs allege that after the change in trustees, Trust money was spent without enough federal oversight. Compl. ¶ 2. Even if Plaintiffs had reason to distinguish administration from non-administration for immunity purposes, their claims surely involve distribution. The immunity clause thus covers the field of the Complaint.

## II. Failure to State a Claim

If this Court had jurisdiction, Plaintiffs would still be obligated to plead enough facts to support a plausible claim for relief. *See Iqbal*, 556 U.S. at 678. But here, the Complaint lacks enough factual material to plausibly connect Plaintiffs' alleged injury to any breach by the United States.

At the threshold, the United States' obligations regarding Plaintiffs were narrow. Plaintiffs allege that by agreeing to the Rescript and reducing its oversight of the Trust, the United States abandoned a slew of obligations under the Amended Trust Agreement and the Memorandum of Agreement. Compl. ¶ 57. But they conceded at argument that the Trust could be amended essentially at will, and that the Rescript did away with most of the obligations the United States had before. *See* Tr. at 17–20. That moots most of Plaintiffs' arguments based on pre-Rescript responsibilities. The only obligations the United States had after the Rescript were the statutory duties that the Department of the Interior reserved: (1) to "approve expenditures not to exceed $2,000,000 in any year from income for projects on [the islands of] Kili or Ejit" and (2) to report to Congress "one year prior to completion of the rehabilitation and resettlement program." Compl. Ex. D at 2 (quoting Pub. L. No. 100-446, 102 Stat. 1798 (1988)).

Taking those duties in reverse order, Plaintiffs have no argument that the United States breached any obligation to report to Congress. Nobody alleges that the Bikini Atoll rehabilitation and resettlement program is anywhere near done. Plaintiffs concede that it is not within a year of completion. *See* Tr. at 10. So no report to Congress has ever come due. *See* Pub. L. No. 100-446, 102 Stat. 1798 (1988).

And as to the first duty, if Plaintiffs wanted to claim that the United States failed to "approve expenditures not to exceed $2,000,000 in any year from income for projects on [the islands of] Kili or Ejit," *see id.*, they would have to allege that there were expenditures on Kili or Ejit that needed approval. There are many possible reasons, after all, why the Trust might have lost money. While diminution of the Trust's value might be "consistent" with large expenditures in particular locations, it does not "plausibly establish" anything. *See Iqbal*, 556 U.S. at 681.

But Plaintiffs, as mentioned, do not include any allegations about any specific expenditures. Nor could they add any such allegations if given the opportunity: They simply do not know where the money went. Tr. at 7–8, 12–13, 15, 18–19, 21. The current allegations are the best Plaintiffs can do. *Id.* at 13, 15, 19. That leaves them without any factual allegations supporting an inference that the United States failed to do what the statute required, nor any ability to prove a breach through discovery and trial.

All that remains is Plaintiffs' argument that the government had some sort of generalized, free-floating, implied obligation to exercise oversight over the Trust. But any such duty would have to be rooted in a statute or in the Rescript. *See Sanganza v. United States*, 164 Fed. Cl. 188, 197 (2023) ("[T]he United States is only subject to fiduciary duties that it 'specifically accepts by statute or regulation,' or that are 'grounded in a contractually based obligation[.]'") (quoting *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015), and *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1296 (Fed. Cir. 2022)).

Plaintiffs do argue that the United States breached its implied covenant of good faith and fair dealing. *See* Pls.' Opp'n at 39–40.[5] The implied covenant, though, "cannot expand [the government's] contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010); *see also Aries Constr. Corp. v. United States*, 164 Fed. Cl. 290, 294–95 (2023). Although Plaintiffs note that the implied covenant also prevents the government from "interfering with [their] enjoyment of the benefits contemplated by" the Trust, *see* Pls.' Notice of Suppl. Authority at 2 (quoting *Centex Corporation CTX v. United States*, 395 F.3d 1283, 1306 (Fed. Cir. 2005)), that comes down to another argument that the government should have exercised more oversight of the Trust after the Rescript. Because Plaintiffs identify no specific textual duty requiring the government to maintain a particular level of oversight or to intervene in the manner they propose, the implied covenant cannot supply the missing element of their claim.

*     *     *     *

The end result is that the Trust's money is gone, and this Court lacks a legal or factual basis to compel the United States to pay again. Plaintiffs therefore cannot solve their dilemma through this Court's binding legal processes. If Plaintiffs want the United States' support for the needs of the Bikini people, they will need to return to where they began — with the generosity of Congress and the American people.

---

[5] The implied covenant applies to contracts. I assume, without deciding, that the government's obligations to Plaintiffs are at least partly contractual in nature.

## CONCLUSION

Defendant's motion to dismiss (ECF 9) is **GRANTED**. The Complaint is **DISMISSED**.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge